UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DAVID WALTRIP,

Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of Social Security

Defendant.

No. 2:17-cv-1390-EFB

ORDER

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for a period of disability and Disability Insurance Benefits ("DIB") under Titles II of the Social Security Act. The parties have filed cross-motions for summary judgment. ECF Nos. 17, 19. For the reasons discussed below, plaintiff's motion for summary judgment is denied and the Commissioner's motion is granted.

I. Background

Plaintiff filed an application for a period of disability and DIB, alleging that he had been disabled since January 1, 2008. Administrative Record ("AR") 208-10. Plaintiff's application was denied initially and upon reconsideration. *Id.* at 137-41, 144-49. On April 15, 2016, a hearing was held before administrative law judge ("ALJ") Curtis Reneo. *Id.* at 30-107. Plaintiff was represented by counsel at the hearing, at which he and a vocational expert testified. *Id.*

/////

1

On May 4, 2016, the ALJ issued a decision finding that plaintiff was not disabled under 216(i) and 223(d) of the Act.[1] *Id*. at 10-22. The ALJ made the following specific findings:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2012.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of January 1, 2008 through his date last insured of December 31, 2012 (20 CFR 404.1571 *et seq*.).

3. Through the date last insured, the claimant had the following severe impairments: cerebellar ataxia, bladder outlet obstruction, osteoarthritis of the bilateral knees, insomnia, hypertension and obesity (20 CFR 404.1520(c)).

\* \* \*

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 *et seq*. Supplemental Security Income ("SSI") is paid to disabled persons with low income. 42 U.S.C. §§ 1382 *et seq*. Under both provisions, disability is defined, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A five-step sequential evaluation governs eligibility for benefits. *See* 20 C.F.R. §§ 423(d)(1)(a), 416.920 & 416.971-76; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. *Yuckert*, 482 U.S. at 146 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. *Id.*

2

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

\* \* \*

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following limitations: the claimant was able to lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently. The claimant was able to sit, stand or walk for 6 hours in an 8-hour workday. The claimant was unable to climb ladders, ropes or scaffolds. The claimant was limited to occasional climbing of ramps or stairs. He was limited to occasional balancing, stooping, kneeling, crouching and crawling. The claimant had to avoid all exposure to work hazards, such as unprotected heights and moving mechanical parts. The claimant was limited to occasional operation of a motor vehicle.

\* \* \*

6. Through the date last insured, the claimant was capable of performing past relevant work as a document copier (DOT: 207.685-018). This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

\* \* \*

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from January 1, 2008, the alleged onset date, through December 31, 2012, the date last insured (20 CFR 404.1520(f)).

*Id.* at 12-21.

Plaintiff's request for Appeals Council review was denied on May 30, 2017, leaving the ALJ's decision as the final decision of the Commissioner. *Id.* at 1-5.

II.  Legal Standards

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

/////

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985). Substantial evidence is more than a mere scintilla, but less than a preponderance. *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

III.  Analysis

Plaintiff argues that the ALJ erred in (1) failing to fully consider the limiting effect of his cerebellar ataxia, bilateral knee disease, and kidney disease with obstructions to the bladder in assessing his residual functional capacity ("RFC"); (2) failing to credit as true his subjective complaints; and (3) and relying on the vocational expert's testimony to find that he could perform his past relevant work.[2] ECF No. 17 at 12-23. As discussed below, none of plaintiff's arguments have merit.

A.  The ALJ's RFC Determination is Supported by Substantial Evidence

Plaintiff first argues that in finding that he maintained the RFC to perform his past relevant work, the ALJ failed to properly consider the impact of plaintiff's cerebellar ataxia, bilateral knee disease, and kidney disease with obstructive bladder would have on his ability to work. ECF No. 17 at 12-18.

1.  Relevant Legal Standards

In between the third and fourth step of the sequential evaluation, the ALJ must assess the claimant's RFC. 20 C.F.R. 404.1520(a)(4). The RFC is the maximum a claimant can perform

---

[2] Plaintiff's arguments are not addressed in the order presented in his motion, but have been reorganized to align with the sequential evaluation.

4

despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In assessing a claimant's RFC, the ALJ is required to consider all relevant evidence, including plaintiff's testimony and opinions from medical sources. SSR 96-8p; *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008). An ALJ's RFC assessment need only include limitations that are supported by substantial evidence. *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).

### 2. Cerebellar Ataxia

Plaintiff first contends that the ALJ failed to fully account for the impact that cerebellar ataxia has on his ability to work. Plaintiff does not dispute that the ALJ discussed the relevant medical evidence pertaining to his cerebellar ataxia. Instead, citing to an article[3] and a video from YouTube, plaintiff contends that individuals with cerebellar ataxia stager backwards and forward and side to side when they attempt to walk. ECF No. 17 at 14-15. Plaintiff also notes that during a consultative examination, the examining physician, Dr. Winnie Tan, observed that plaintiff "is unable to do heel walk and toe walk. He is very unsteady cerebellarly and he cannot do tandem walk. I believe this may be a reflexion [sic] of his ischemic changes in the cerebellum as seen on his MRI." *Id*. at 14-15 (citing AR 480). Based on the article, YouTube video, and Dr. Tan's findings, plaintiff contends that he is hypermobile and wobbles from side to side when he moves, which directly affects his ability to perform his past relevant work. *Id*. at 13-15.

While the article and YouTube video cited by plaintiff may indicate that some individuals with cerebellar ataxia wobble from side to side when they walk, the record does not indicate that plaintiff wobbles when he walks. Rather, Dr. Tan only found that plaintiff could not tandem, heel, or toe walk. AR 480-81. Notwithstanding those findings, Dr. Tan opined that plaintiff could walk or stand for six hours in an eight-hour workday, but should avoid heights due to his cerebellar dysfunction and marked imbalance. *Id*. at 481. That opinion, which plaintiff does not challenge, is consistent with the ALJ's RFC determination and constitutes substantial evidence supporting the ALJ's RFC determination. *Id*. at 14; *see Tonapetyan v. Halter*, 242 F.3d 1144,

---

[3] The article, *Pathophysiology of Cerebellar Antaxia*, which was published in the journal Movement Disorders, is attached as Exhibit A to plaintiff's motion for summary judgment. ECF No. 17-1.

1149 (9th Cir.2001) (an examining physician's opinion alone constitutes substantial evidence where it rests on the physician's own independent examination). Thus, the ALJ's RFC determination accounted for the impact of plaintiff's cerebellar ataxia on his ability to work.

          3.     <u>Bilateral Knee Disease</u>

Plaintiff also contends that the ALJ failed to consider the limitations imposed by his bilateral knee disease. ECF No. 17 at 15. Plaintiff asserts that he has consistently been treated for chronic knee pain—requiring multiple injections that were ultimately unsuccessful in relieving his pain—and that he requires a cane for ambulation. *Id*. at 17 at 17 (citing AR 587, 678, 679). He also cites to a treatment records from his nurse practitioner, Anne Egem, which reflects plaintiff's complaints of severe knee pain, which is allegedly aggravated by bending, walking, standing, and cold temperatures. *Id*. at 21 (citing AR 525).

The problem with plaintiff's argument is that it relies primarily on treatment records from after December 31, 2012, his date last insured. *See* AR 525 (12/20/13 treatment note from nurse practitioner Egem), 588 (7/17/14 record document use of cane), 678 (reported injections didn't help on 3/1/16), 679-80 (1/19/16 treatment note stating injections helped a little). The evidence from before the date last insured, however, fails to demonstrate knee problems that impose limitations greater than those found by the ALJ.

In mid-2006, before the alleged onset date, plaintiff was seen for knee pain with occasional buckling after he fell off a golf cart. AR 375, 380-81. He had tenderness to palpation of the medial joint and under the facets of his patella, but otherwise his examinations were generally normal. *Id*. at 375, 380. X-rays of his knees were essentially unremarkable (*id*. at 378, 381), but MRI findings were compatible with spontaneous osteonecrosis of the knee involving the medial femoral condyle (*id*. at 383). At a follow-up appointment in November 2006, plaintiff described his pain as "more of an ache." *Id*. at 392. On exam, his range of motion was normal, and he no longer was tender to palpation. *Id*. at 393.

The next medical record documenting reports of knee pain is dated July 2, 2012, when plaintiff underwent a psychological evaluation. AR 466. Plaintiff reported that his knee pain level was at "three to four" without pain management, but it reduced to a "zero" with pain

6

management. *Id*. The following day, plaintiff underwent a complete internal medicine evaluation with Dr. Tan. *Id*. at 475-82. Dr. Tan diagnosed plaintiff with bilateral knee arthritis with reduced range of motions on both knees, but examination of the lower extremities was otherwise normal. *Id*. at 480-81. She opined that plaintiff could lift 20 pounds occasionally and 10 pounds frequently; walk or stand for six hours in an eight-hour workday with reasonable break; sit without limitation; occasionally kneel, crawl, and stoop; and should avoid heights due to cerebella dysfunction. *Id*.

Aside from these consultative evaluations, the only medical record from 2012 documenting plaintiff's knee pain is from October 2012. AR 506-07. Plaintiff was seen "for follow-up of his knee giving out." *Id*. Examination showed a full range of motion and no deformities, cyanosis, edema, instability, or swelling. *Id*. at 507. Plaintiff was prescribed a knee brace and instructed to follow-up in three months. *Id*.

An MRI of the right knee from February 2013, after plaintiff's date last insured, showed small oblique tear in the posterior horn of the medial meniscus, degeneration without tear in the lateral meniscus posterior horn, interstitial strain/tear in the posterior cruciate ligament and minimal joint effusion. *Id*. at 554. An MRI of the left knee showed osteochondral abnormality of the medial femoral condyle, attenuated articular cartilage with near full-thickness abnormality, and degenerative change without tear in the menisci. *Id*.at 555. Upon examination, plaintiff had mild knee pain with flexion and extension, but was negative for muscle pain, joint swelling, cramping, inability to move, and muscular weakness, and was able to move and walk without limping or an assistive device. *Id*. at 544. Plaintiff continued to complain of knee pain in late February and March, but findings on examination remained unremarkable. *Id*. at 54-42.

In April 2013, plaintiff was seen by an orthopedist and received a cortisone injection. *Id*. at 653-54. At a follow-up appointment two months later, plaintiff had some tenderness to palpation around his knee, and it was noted that the injection only provided relief for three days. *Id*. at 558, 655, 657. In July 2013, plaintiff underwent left knee arthroscopy and debridement. *Id*. at 667. Postop records show that he felt "better overall" and that his pain was a level three out of ten. *Id*. It was noted that plaintiff walked with a mild limp and used an assistive device. *Id*.

However, he had full range of motion and no tenderness to palpation over his left knee. *Id*. In September 2013, plaintiff reported that his pain was "very manageable," and he was directed to take ibuprofen as needed. *Id*. at 533-34. Examination findings from the following month were unremarkable, and plaintiff continued to report that his pain level was a three out of ten. *Id*. at 531. Nurse practitioner Egem encouraged plaintiff to use a knee brace, exercise as much as he could, and continuing taking acetaminophen for pain. *Id*. at 531-32.

The following month, plaintiff used a cane for ambulation and stated that his knee sometimes wants to give out. *Id*. 669. However, he also reported that he had no pain. *Id*. In December 2013, he complained of sharp knee pain that was worsening. *Id*. at 525. His left knee had mild tenderness on palpation and moderate pain with range of motion. *Id*. at 528. Plaintiff was again instructed to take acetaminophen or ibuprofen for pain as needed. *Id*. Subsequent treatment records show regular treatment for knee pain, which included receiving injections in 2015 and 2016. *Id*. at 587-90, 601-23, 638-39, 678-95.

These medical records demonstrate that prior to December 31, 2012, the date last insured, plaintiff's knees generally caused no more than mild pain, which was effectively managed with over-the-counter medication. More significantly, plaintiff testified at the administrative hearing that in 2012, he did not often experience pain, but "just a little discomfort." AR 78. Although the evidence cited by plaintiff suggests worsening symptoms after 2012, it does not demonstrate significantly limitations during the relevant period. *See Tidwell v. Apfel*, 161 F.3d 559, 601 (9th Cir. 1998) (to be entitled to DIB benefits, the claimant must establish that his disability existed on or before the date last insured).

      4. <u>Kidney Disease and Bladder Impairment</u>

Plaintiff further argues that the ALJ erred by failing to discuss the effect his kidney disease with obstructive bladder impairment had on his ability to work. ECF No. 17 at 17-18. Contrary to plaintiff's contention, the ALJ consider the evidence related to his obstructed bladder and ultimately concluded that it did not impair plaintiff's ability to work.

As discussed by the ALJ, plaintiff reported to the emergency room with complaints of urinary retention in January 2012. AR 16, 443. A foley catheter was placed to assist with

8

obstruction, returning 300 milliliters of urine. *Id*. at 443. One week later, plaintiff returned to the emergency room, requesting the catheter be removed. *Id*. at 433-35. He was notified that he may be unable to void, requiring the catheter to be replaced. *Id*. at 434. Ten days later, plaintiff again sought treatment at the emergency room with complaints of urinary retention. *Id*. at 427-29. A foley catheter was placed, and plaintiff was instructed to follow up with his primary care provider. *Id*. at 429. His primary care physician subsequently removed the catheter and prescribed Flomax. 456-59. Shortly thereafter, he complained he had been wetting the bed since starting Flomax. *Id*. at 456. In July 2012, plaintiff underwent a cystoscope and transurethral resection of the prostate to address his bladder obstruction.[4] *Id*. at 493. He was seen again by his primary care physician a few months later, but no bladder issues were noted at that time. *Id*. at 506. Plaintiff subsequently switched treatment providers due to insurance issues. *Id*. at 543-44. At his initial examination, he reported prior issues with urination, but further stated that he was urinating better and had no issues with urgency, frequency, or dribbling. *Id*. at 543-44. Significantly, subsequent treatment records fail to document any bladder problems or issues with urination. *Id*. at 525-42, 587-623.

These medical records demonstrate that plaintiff's surgery resolved his bladder issues. Accordingly, the ALJ properly found that plaintiff's bladder obstruction did not cause any functional limitations. *Cf Warre v. Comm'r Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for purposes of determining eligibility for" disability benefits.").

        B.       <u>The ALJ was not Required to Credit as True Plaintiff's Subjective Complaints</u>

Plaintiff argues that the court should credit as true his testimony because "the Commissioner's conclusions are not supported by the evidence." ECF No. 17 at 23.

/////

/////

/////

---

[4] Although plaintiff attributes his bladder obstruction to his kidney disease, medical records show that prostate issues were causing his bladder obstruction. AR 493.

Where the ALJ improperly rejects evidence establishing disability, the district court may remand the matter for immediate payment of benefits under the credit-as-true- rule. *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004). A case may be remanded under the "credit-as-true" rule for an award of benefits where:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014).

Although plaintiff contends his testimony should be credited as true, he does specifically argue that any of ALJ's reasons for rejecting his testimony were legally insufficient. *See Trevizo*, 871 F.3d at 678 ("[T]he ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so."). By failing to challenge the ALJ's reasons for discounting his credibility, plaintiff has waived the issue. *Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006) (argument not raised in the district court are waived); *Hibbs v. Dep't of Human Res.*, 273 F.3d 844, 873 (9th Cir. 2001) (finding that the appellant's failure to develop his argument rendered it incapable of assessment by the court); *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1161 n.2 (9th Cir. 2008) (declining to address whether the ALJ properly rejected claims of memory problems because the plaintiff "failed to argue this issue with any specificity in his briefing."); *see also Reynolds v. Colvin*, 2013 WL 6478469, at *8 (C.D. Cal. Dec. 9, 2013) ("Plaintiff fails to discuss, or even acknowledge, the ALJ's other reasons for finding her not credible. Therefore, plaintiff has waived any challenge to the remaining aspects of the ALJ's credibility finding.").

In any event, the ALJ provided numerous reasons for finding that plaintiff's allegations regarding the severity of his symptoms and their limiting effect were not fully credible. The ALJ first observed that plaintiff described daily activities that were inconsistent with his complaints of disabling symptoms and limitations, including his ability to care for his elderly mother, perform personal care, prepare meals, complete household chores, perform yard work, drive a car, shop in

stores, use a computer, manage funds, read books, and visit with others. AR 18; *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) ("Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."); *Smolen*, 80 F.3d at 1284 (ALJ may rely on inconsistent testimony in assessing a claimant's credibility); *see, e.g.,* AR 39-54 (prepares own meals; cares for himself; performs house work, including sweeping, mopping, vacuuming, and laundry); 58 (drives a car and goes grocery shopping by himself); 63 & 420 (acts as caretaker for mother).

The ALJ further found that the extent of plaintiff's medical treatment was inconsistent with his claim of total disability, specifically noting that plaintiff alleged disability since 2008 but the record only shows treatment beginning in 2012. AR 18; *see Trevizo v. Berryhill*, 871 F.3d 664, 679 (9th Cir. 2017) (subjective complaints may be undermined by an unexplained failure to obtain treatment); *see* AR 400 (first treatment record from after disability onset date of January 1, 2008, which is dated January 25, 2012). The ALJ also observed that plaintiff's employment history showed prolonged periods of unemployment prior to the disability onset date, raising questions as to whether plaintiff's current unemployment was actually due to medical impairments. AR 18; *see Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (ALJ properly found poor work history and lack of propensity to work in lifetime negatively affected claimant's credibility regarding her inability to work); AR 215 (showing no income in 2001 and 2002, and limited income in 2003). Similarly, the ALJ noted that plaintiff stopped working due to a business-related layoff rather than an inability to work. AR 18; *see Drouin v. Sullivan*, 966 F.2d 1255, 1258 (9th Cir. 1992) (ALJ properly reduced credibility based on evidence that plaintiff "did not lose her past two jobs because of pain."); AR 233 (reflecting plaintiff stopped working on 1/1/08 because he was laid off).

The ALJ also found that plaintiff's allegations regarding his knee pain were not credible given that he injured his knee well before his disability onset date but still maintained the ability to work prior to that date. AR 18; *Dugger v. Berryhill*, 2018 WL 1413367, at \*5 (D. Id. Mar. 21, 2018) (ALJ may consider claimant's ability to work after sustained injury in assessing

11

credibility); *Gonzalez v. Astrue*, 2013 WL 394415, at *14 (E.D. Cal. Jan. 30, 2013) (same); *see Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996) (the ALJ is entitled to make logical inferences stemming from the evidence); AR 375 (5/24/06 treatment note reflecting persistent knee pain after falling off golf cart six days earlier), AR 234 (reflecting plaintiff worked between 2003 and 2008).

Lastly, the ALJ found that plaintiff was not fully credible due to inconsistent statements. Specifically, the ALJ noted that plaintiff claimed he could only sit for 6 minutes and walk only two blocks, but that he reported to Dr. Lacy that his pain level was zero with medication. AR 19; *see Smolen*, 80 F.3d at 1283 (finding that an ALJ may rely on inconsistent statements in assessing a claimant's credibility); AR 71, 225, 466.

Accordingly, the ALJ provided several clear and convincing reasons, each supported by substantial evidence, for rejecting plaintiff's subject complaints. Consequently, there is no basis for crediting plaintiff's testimony as true. *See Garrison*, 759 F.3d at 1020.

C. The ALJ Properly Relied on the Vocational Expert's Testimony

Plaintiff also contends that the ALJ erred in relying on the vocational expert's testimony to find that he was not disabled. First, plaintiff argues that the ALJ improperly failed to resolve a conflict between the vocational expert's testimony and the DOT. Second, he claims that the ALJ was required to find him disabled under Medical Vocational Guidelines (the "Grids"). ECF No. 17 at 18-22.

At the fourth step of the sequential evaluation, the claimant bears the burden of demonstrating that he can no longer perform his past relevant work "either as actually performed or as generally performed in the national economy." *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155 (9th Cir. 2008). "Past relevant work" is work that a claimant has "done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. §§ 404.1560(b)(1). "Although the burden of proof lies with the claimant at step four, the ALJ still has a duty to make the requisite factual findings to support his conclusion." *Pinto v. Massanari*, 249 F.3d 840, 844 (9th Cir. 2001). This requires the ALJ to

/////

compare plaintiff's RFC to the physical and mental demands of plaintiff's past relevant work. 20 C.F.R. §§ 404.1560(b).

The ALJ should first assess whether the claimant can perform his past relevant work as it was actually performed. SSR 96-8p; *Pinto*, 249 F.3d at 845. The claimant's testimony and vocational reports are important sources of information regarding how the prior work was actually performed. *Id*. An ALJ may also seek information from a vocational expert or the Dictionary of Occupational Titles ("DOT"). 20 C.F.R. §§ 404.1560(b)(2),416.960(b)(2); SSR 82–61. If the claimant cannot perform the job as it was actually performed, the ALJ then assesses whether the claimant can perform the occupation as it is generally performed. SSR 96-8p. The best source for determining whether the claimant can perform his past relevant work as it was generally performed is the DOT. *Pinto*, 249 F.3d at 845. The ALJ may also rely on vocational expert's testimony. *Id*. However, "[i]n order for an ALJ to accept vocational expert testimony that contradicts the Dictionary of Occupational Titles, the record must contain 'persuasive evidence to support the deviation.'" *Id*. at 846.

Based on plaintiff's description of his prior jobs, the vocational expert testified that plaintiff's past relevant work included work as a document copier (DOT: 2017.685-018).[5] AR 103. Based on the DOT's description of the occupation, the ALJ determined that plaintiff retained the ability to perform the document copier occupation as generally performed because it is classified as light work[6], does not involve working around hazards, and only requires occasional stooping and crouching. AR 20. The ALJ further noted that the vocational expert confirmed that an individual with plaintiff's RFC, and of similar age and education, would be able to perform the job. AR 20, 104-05.

Plaintiff argues that the ALJ failed to resolve a conflict between the vocational expert's testimony and the DOT's description of the document copier occupation. ECF No. 17 at 18-22.

---

[5] The DOT refers to the position as "photographic-machine operator," but both the ALJ and the VE refer to the occupation as document copier. *See* DOT 207.685-018, 1991 WL 671746.

[6] Light work involves lifting no more 20 pounds occasionally and 10 pounds frequently and a good deal of walking or standing. 20 C.F.R. 404.1567(c).

According to plaintiff, the DOT provides that a document copier must be able to move swiftly and accurately, which he purportedly is unable to do. *Id.* at 19. However, there is nothing in the record supporting plaintiff's contention that he cannot move swiftly or accurately. More significantly, the DOT's description of the document copier occupation does not state that a worker must be able to move swiftly or accurately to perform the occupation. *See* Photographic-Machine Operator, DOT 207.685-018, 1991 WL 671746. Instead, the DOT's description identifies exertional demands that are consistent with the ALJ's RFC determination. *Id.*

Plaintiff's remaining challenges to the ALJ's reliance on the vocational expert's testimony are predicated on his contention that the ALJ failed to account for limitations imposed by his cerebellar ataxia, knee problems, and bladder impairment. ECF No. 19-21. As discussed above, the ALJ properly considered these impairments in assessing plaintiff's RFC.

Lastly, plaintiff argues that the ALJ was required to find him disabled under the Grids. The Grids, however, are used at step-five to determine whether other work exists that the claimant can perform. *Hoopai v. Astrue*, 499 F.3d 1071, 1075 (9th Cir. 2007). Here, the ALJ found that plaintiff was able to perform his past relevant work at step four, and therefore he had no need to apply the grids. *See Fasick v. Colvin*, 2013 WL 2445207, at *8 n.9 (C.D. Cal. June 5, 2013) ("[T]he ALJ properly found at step four that Plaintiff was capable of performing her past relevant work; thus, the Grids, which are used at step five, did not apply."); *Bottjer v. Astrue*, 2009 WL 212407, at *9 (E.D. Wash. Jan. 29, 2009) ("Because Plaintiff did not meet her burden at step four, the ALJ properly found her not disabled; he was not obliged to continue to step five, and there was no need to apply the Grids."); *Hansen v. Astrue*, 2012 WL 1032533, at *7 n.3 (D. Id. Mar. 27, 2012) (same).

Accordingly, plaintiff has failed to demonstrate that the ALJ erred in finding that he maintained the ability to perform his past relevant work.

IV. Conclusion

Accordingly, it is hereby ORDERED that:

1. Plaintiff's motion for summary judgment is denied;

2. The Commissioner's cross-motion for summary judgment is granted; and

3. The Clerk is directed to enter judgment in the Commissioner's favor and close the case.

DATED: September 19, 2018.

/s/ Edmund F. Brennan
EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE